IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
United States Department of Justice
Consumer Protection Branch
450 5th St. NW, Suite 6400
Washington, DC 20001,

      Plaintiff,

      v.

VISION PATH, INC., a corporation, also d/b/a
Hubble Contacts,
215 Park Ave S, 11th Floor
New York, New York 10003.

      Defendant.

Case No.: 1:22-cv-00176

**COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF**

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1)  alleges:

## PRELIMINARY STATEMENT

1.     Plaintiff brings this action under Sections 9(a) and 9(b) of the Fairness to Contact Lens Consumers Act ("FCLCA"), 15 U.S.C. §§ 7608(a) and (b), and Sections 5(a)(1), 5(m)(1)(A), 13(b), 16(a)(1), and 19 of the FTC Act, 15 U.S.C. §§ 45(a)(1), 45(m)(1)(A), 53(b), 56(a)(1), and 57b, which authorize the FTC to seek, and the Court to order, monetary civil penalties, permanent injunctive relief, rescission or reformation of contracts, the refund of monies paid, and other relief for the Defendant's acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Sections 9(a) and 9(b) of FCLCA, 15 U.S.C.

§§ 7608(a) and (b), and Sections 315.5(a) and (d)-(f) of the Contact Lens Rule ("Rule"), 16

C.F.R. § 315(a), (d)-(f) (2019) (unless noted otherwise, all citations to the Contact Lens Rule in

this Complaint are to the Rule as it existed prior to the amended and re-numbered Rule re-issued

by the Commission August 17, 2020, because the majority of the alleged Rule violations

occurred under the previous version of the Rule).  Defendant's violations are in connection with

acts and practices that circumvented the FCLCA and Contact Lens Rule, and unlawfully

switched consumers from the contact lenses their eye doctors prescribed to Defendant's contact

lenses.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

1345, and 1355.

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (c)(2), 1395(a)

and 15 U.S.C. § 53(b).

## <u>THE DEFENDANT</u>

4.      Defendant Vision Path, Inc., also doing business as Hubble Contacts ("Hubble" or

"Defendant"), is a Delaware corporation with its principal place of business at 215 Park Ave S,

11th Floor, New York, New York 10003.  Hubble transacts or has transacted business in this

District and throughout the United States.  At all times relevant to this Complaint, acting alone or

in concert with others, Hubble has advertised, marketed, distributed, or sold contact lenses to

consumers throughout the United States.

5.       Hubble sells its own brand of contact lenses, Hubble contacts, direct to

consumers via a monthly subscription model, primarily through its website

www.hubblecontacts.com.

## COMMERCE

6.     At all times relevant to this Complaint, the Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE CONTACT LENS RULE AND THE MARKET FOR CONTACT LENSES

7.     Under the FCLCA and the Contact Lens Rule, contact lens sellers may sell contact lenses only in accordance with a contact lens prescription that is either presented to the seller or verified by direct communication with the prescriber.  15 U.S.C. § 7603(a); 16 C.F.R. § 315.5(a).  If the seller does not have a copy of a prescription, it must communicate a prescription verification request to the patient's prescriber by telephone, fax, or electronic mail. The request must include certain information, including the patient's full name and address, and the contact lens power, manufacturer, and base curve.  15 U.S.C. § 7603(c); 16 C.F.R. § 315.5(b).  If, within eight business hours of the request, a prescriber communicates to the seller that the prescription information she received is not a valid prescription for that patient, verification is denied and the seller must cancel the sale.  If the prescriber approves the verification request, or fails to communicate with the seller within eight business hours of a valid verification request, the seller can legally sell the contact lenses.  15 U.S.C. § 7603(d); 16 C.F.R. § 315.5(c).  A sale that occurs after a prescriber has failed to respond to a valid verification request within eight business hours is typically referred to as "passive verification."

8.     The FCLCA and the Contact Lens Rule do not allow sellers to alter contact lens prescriptions from what is written on consumers' prescriptions by the prescriber, unless the lens is identical to the prescribed lens.  15 U.S.C. § 7603(f); 16 C.F.R. § 315.5(e).

9.      The Contact Lens Rule further requires contact lens sellers to maintain communications from the prescriber, including prescription verifications, as follows: (a) if the communication occurs via facsimile or e-mail, a copy of the communication and a record of the time and date it was received; or (b) if the communication occurs via telephone, a log describing the information communicated, the date and time that the information was received, and the names of the individuals who participated in the call.  16 C.F.R. § 315.5(f).

10.     In 2020, the Contact Lens Rule was amended to, inter alia:  require that if sellers verify prescriptions via automated telephone messaging, the message be delivered in a slow and deliberate manner, be repeatable at the prescriber's option, and be recorded by the seller; clarify the meaning of "alteration of prescription" to include a seller giving a prescriber the name of a manufacturer or brand other than that specified by the patient's prescription; and require that sellers accept a consumer's prescription presentation.   These amendments went into effect on October 16, 2020 and are not retroactive.  The majority of the alleged Rule violations occurred prior to the effective date of the amendments.

11.     In the United States, a contact lens prescription typically includes, among other things, the brand, power, base curve and diameter of the lens.  Prescribers write contact lens prescriptions for specific brands and models that they have fit on their patients' eyes, and often will see their patients for multiple visits prior to finalizing a prescription for a specific lens.  In order to fit lenses on patients' eyes, prescribers typically obtain fitting kits from contact lens manufacturers.  Typically, prescribers will not prescribe a contact lens that they have not seen on their patients' eyes.  Often a patient will receive a trial set to take home for a few days, and then will return for a follow-up so the optometrist can evaluate how the lenses are fitting and whether the lenses are causing any health or vision problems for the patient.

4

## THE DEFENDANT'S BUSINESS ACTIVITIES

12.     Since October 2016, Hubble has sold its own brand of daily contact lenses, Hubble contacts, direct to consumers through its website, www.hubblecontacts.com, using a negative-option subscription model.  Hubble markets its lenses through targeted social media and television advertisements.

13.     Hubble created and implemented a website, ordering process, and verification system that effectively substituted Hubble-brand contact lenses for the lenses originally prescribed by the consumers' eye care practitioners thereby violating both the FCLCA and the Contact Lens Rule.  Specifically, Hubble:  (A) led consumers to believe they had provided Hubble with their relevant prescription information, and that Hubble would communicate with the consumers' eye care practitioners to verify and ensure consumers received lenses with their proper prescription, and (B) used verification practices that made it unduly difficult (and sometimes impossible) for prescribers to confirm that consumers' prescription information was correct, or to deny the verification when the prescription was not correct.  Hubble also provided free contact lenses to select customers in exchange for them providing testimonials about Hubble on Internet review websites, such as the Better Business Bureau and HighYa.  Neither Hubble nor these endorsers disclosed that the endorsers had been compensated with free product for their reviews.  Hubble also violated the Contact Lens Rule by failing to follow important recordkeeping rules intended to allow the FTC to oversee Hubble's verification practices.

### The Ordering Process and Subscription Plan

14.     Consumers sign up for a first shipment that contains 15 pairs of lenses (roughly a two-week supply) for free except for a nominal shipping and handling charge (during some periods $3, and currently $1).  Hubble then automatically enrolls consumers in a subscription

plan that delivers 30 pairs of daily contact lenses to them each month.  The initial cost for the subscription was $30 each month, and currently is $39 per month, plus an additional $3 shipping and handling fee.

15.    Hubble contact lenses are manufactured by St. Shine Optical Co. in Taiwan and are FDA approved, though the lenses are made of methafilcon A, a material that is no longer commonly prescribed for contact lenses in the United States.

16.    Hubble's customer ordering process and subscription enrollment takes place online.  From October 2016 until approximately August 2019, the Hubble website did not permit consumers to present or upload a copy of their prescription, select a brand of contact lenses other than Hubble, or inform Hubble that their prescriptions were not for Hubble lenses.  Instead, when consumers went to the Hubble website to order lenses, they were simply asked to enter their right and left eye contact lens powers in response to an invitation to "tell us about yourself and we'll get your subscription started."  Apart from the corrective power of their lenses, which represents just one element of a contact lens prescription, consumers were not asked, nor were they able to enter, any other elements, including brand, material, base curve, and diameter.  Instead, The Hubble website stated, below the entry spaces for a consumer's powers, in faint gray text much smaller than the language requesting the entry of contact lens powers, that "Hubble lenses have a base curve of 8.6 and a diameter of 14.2.  They are made of methafilcon A and manufactured by St. Shine Optical Co."  This text was neither described nor presented as part of the patient's contact lens prescription.  It appeared as follows:

17.     The Hubble website only asked consumers for, and they were only able to select, their contact lens powers, even though written prescriptions consumers receive from their eye care providers also include other specifications, such as brand, base curve, and diameter.  Some consumer prescriptions also include information specific to toric lenses, such as cylinder and axis information, which are required for anyone with astigmatism.  Hubble's ordering page did not mention or provide space to enter any of this information.  Further, the wording of the small, faint gray text below the power information stated what Hubble lenses are made from and who their manufacturer is, whereas prescriptions consumers receive from providers do not typically include this information, instead stating the brand and model, such as Acuvue Oasys (made of senofilcon A and manufactured by Johnson & Johnson) or Focus Dailies (made of nelfilcon A and manufactured by Alcon).  Despite the lack of resemblance between Hubble's prescription-input page and a consumer's actual prescription from a provider, when consumers entered their powers and clicked to make a purchase, Hubble treated their action as a de facto confirmation

that the prescription they received from their provider was for Hubble lenses with a base curve of

8.6 and a diameter of 14.2, made of methafilcon A, and manufactured by St. Shine Optical Co.

18.     After consumers entered their lens powers, the Hubble website asked them to

enter their prescribers' contact information, stating "[w]ith this [or later, your] info, we'll verify

your prescription with your doctor."  For many consumers, the prescriber and prescriber's office,

city, and state appeared from Hubble's pre-populated list of prescribers as the consumers type

them into the system.  If the prescriber's name did not automatically appear in the pre-populated

list, consumers are able to enter the information manually.

19.     More recently—since the FTC informed Hubble it was investigating Hubble's

business practices, and since the FTC amended the Contact Lens Rule—Hubble has made some

alterations to the Hubble ordering page.

20.     As noted above, prior to the announcement of the Contact Lens Rule

amendments, which went into effect on October 16, 2020, Hubble did not ask consumers for

copies of their contact lens prescriptions, nor would it typically permit consumers to upload,

email, or otherwise provide Hubble with copies of their contact lens prescriptions, even when

consumers offered to do so during communications with Hubble's customer service

representatives.  Instead, Hubble set up its customer service system so as not to accept

attachments from consumers, which ensured that consumers could not present copies of their

prescriptions.  This was done, at least in part, because Hubble determined that it would need to

cancel orders when they received prescriptions for brands other than Hubble.  By not allowing

prescription presentation, and by only letting consumers enter their powers and no other

prescription information, Hubble could then contact the prescriber with a verification request as

if the consumer had "confirmed" that her prescription was for Hubble lenses.

## **Defendant's Flawed Verification System**

21.     After the consumer has entered her lens powers and submitted an order, a Hubble representative was tasked with calling the customer's eye care prescriber to play an automated verification message.  Sometimes the agent played the automated message after someone from the prescriber's office answers the line and agreed to listen, at other times, the agent simply left the automated message on the prescriber's voicemail.  In some instances, no calls were made, or verification messages were left at a phone number that the agent could easily have determined was not associated with an eye care prescriber.

22.     Until shortly after the announcement of the Contact Lens Rule amendments, the Hubble verification messages were relayed in a robotic computerized voice with strange pronunciations and peculiar word phrasing, starting abruptly by spelling the individual letters of the consumer's name without otherwise stating the consumer's name in the message.  The messages also sometimes commenced while the live agent was talking, making them even harder to understand, and sometimes the messages were played, in their entirety, over hold music, even though it was evident that no one from the prescriber's office was listening.

23.     Until shortly after the announcement of the Contact Lens Rule amendments, none of the information in the verification message was repeated or repeatable (unless it happened to be recorded by the prescriber's voicemail) and the agent who initiated the call typically did not stay on the line to ensure that the entire message had been relayed and received.  Instead, the live agent would disconnect, and Hubble considered it a valid verification if the call lasted the amount of time it takes for the computer-generated voice to recite the required verification information, whether or not such information was relayed in an understandable manner, or relayed at all.

24.     While prescribers and consumers almost uniformly refer to contact lenses by brand name and model, Hubble's verification messages did not include such information. Instead, they identified the lenses by stating the lesser-known name of the lens manufacturer, St. Shine.  Until early 2021, Hubble's verification message did not include the words "Vision Path" or "Hubble" even though prescribers (and consumers) almost always refer to the company's lenses as Hubble's lenses.  The messages also include the customer's address; the powers, base curve and material of the Hubble lenses; the date of the customer's order; in some instances, the date and time of the verification; and at times, a customer reference number.

25.     The closing of the Hubble verification message to prescribers stated:

> If you have questions about our verification process, please call [name of representative] at this number [***-***-****] which is toll free, and we will do our best to reply to any questions within 2 business days.  Send faxes to [***-***-****] for all other items, including verification responses.

26.     This wording—in which the number for calling with questions is provided prior to the fax number for responding to verification requests—caused many prescribers' offices to misunderstand the instructions and call the first, or wrong, phone number to communicate a verification denial.  Meanwhile, according to Defendant's stated internal policies, Hubble only accepted verification denials via fax, not by phone.  However, under the Contact Lens Rule, once the seller receives a denial from a prescriber, it shall not sell the lenses.  In other words, the Contact Lens Rule does not allow the seller to dictate the prescriber's method of providing a denial to a verification request.

27.     For a certain period, Hubble's verification messages also instructed prescribers to provide a 13-digit reference number in order to deny a verification request.  However, many of Hubble's verification messages only included an 11- or 12-digit reference number. Hubble also

had an internal policy that a faxed denial from a prescriber's office that did not contain a consumer name or verification number did not constitute a "valid denial," and therefore it was free to sell its lenses to that consumer once the eight-business-hour period had passed.

28.    At other times relevant to the Complaint, Hubble ceased using reference numbers altogether in its verification calls.  This appears to have occurred after one of the company's founders suggested, in a document entitled "revenue ideas," that Hubble should "remove reference numbers."  By removing reference numbers from the messages, the messages may have become less cluttered with information, but it also became more difficult for prescribers— especially those who could not discern the patient's name from the verification call—to identify the order and deny it, thus allowing Hubble to proceed with the sale of lenses and consequently generate more revenue.

29.    After the FTC announced it was amending the Contact Lens Rule to expressly require that automated verification messages deliver prescription information in a slow and deliberate manner at a reasonably understandable volume, Hubble altered its messages to make the computerized voice much easier to understand, although, continuing until at least January 2021, the wording and structure of the messages still left them ripe for prescriber confusion, with the phone number for prescribers to contact Hubble "if they have questions" about the verification process still given greater prominence and provided before the fax number for actual verification responses.  Furthermore, the fax number that Hubble indicated was for responding to verification requests was still listed before any explanation that faxing is the way prescribers should respond to verification requests.  The persistent effect of this counterintuitive structure was to continue to make it appear to prescribers, incorrectly, that the phone callback number was the way to respond to verification requests.  Hubble was aware of the flaws in its verification

process from early on.  In numerous instances, prescribers complained to Hubble about the intelligibility of the verification calls, informing Hubble that they could not determine the identity of the patient, or that the message was garbled or incomplete.  Yet, in numerous instances, Hubble failed to respond to messages left at the phone number provided in the verification call.  A document describing Hubble's internal policy for these calls indicates that, in lieu of responding directly to prescribers who said they could not understand the information on the verification message, Hubble would resend the prescriber the same verification message.

30.     Hubble failed to take action to make its verification messages clearer even though it was on notice, based on a multitude of prescriber complaints, that its verification messages were difficult (or impossible) to understand.  Instead, at times, Hubble responded to prescribers who complained by telling them that the Hubble messages contained all the information required under the Contact Lens Rule.

31.     Prescribers' numerous complaints put Hubble on notice that these calls were deficient and invalid verification calls, and that Hubble had a systemic issue with the quality and completeness of the messages left for prescribers. Yet until the FTC announced amendments to the Contact Lens Rule relating to improving verification call quality, Hubble continued to send verification messages that were difficult or even impossible for prescribers to understand.

32.     In some instances, Hubble's agents left verification messages at phone numbers that are clearly not eye care practitioners, or even doctor's offices.  For instance, agents placed verification calls to numbers that were easily confirmed to have been that of an internal medicine doctor, otolaryngologist, and a garden center of a warehouse sales club.

33.     In some instances, Hubble sold lenses to consumers even though consumers entered fictitious prescriber information, making it clear that Hubble could not have made compliant verification calls.

34.     In at least one instance, Hubble sold lenses even though it did not place any, or any compliant, verification calls or faxes, or otherwise attempt to verify the prescription information provided by the consumer.

35.     In at least one instance, Hubble sold lenses to a customer even after the prescriber communicated that the verification request was invalid, inaccurate, or otherwise denied.  A Hubble document instructed its representatives that if prescribers communicate denials of verification requests via the customer service line, the representatives were to inform prescribers to fax in the denial, instead of invalidating the sale.

36.     Since, under the Contact Lens Rule, sellers may only sell lenses after receiving a copy of a contact lens prescription (something Hubble rarely accepted), or verifying a prescription by direct communication, sales that occurred following incomprehensible or incomplete verification requests, whether or not they were responded to by a prescriber, violated the Rule prior to the 2020 amendments and clarifications.  Similarly, verification calls to phone numbers clearly not associated with prescribers or sales after no, or otherwise deficient, verification attempts were made, violated the Rule.  Sales after prescribers informed Hubble of a denial also violated the Rule.

**The Defendant's Knowing Alteration of Prescriptions**

37.    Hubble knowingly placed verification calls and faxes to prescribers who have never received fitting kits for Hubble lenses, and thus do not prescribe Hubble lenses.  In fact, the pre-populated list of prescribers from whom consumers can select their prescriber includes thousands of prescribers who do not possess—and have never possessed—a Hubble fitting kit. According to Hubble, as of April 2018, it had provided fitting kits to 352 practice groups.  At around the same time, it listed 26,188 names of prescribers on its drop down menu for consumers to select for verification.  Hubble's  own documents advise that a consumer should be fit for Hubble lenses prior to ordering, but despite the vast discrepancy between the number of practices who had fitting kits and the number of prescribers from whom Hubble sought verification, Hubble did not alter its business practices.

38.    Hubble also continued to place verification calls to prescribers who had expressly informed Hubble that they did not prescribe Hubble lenses, and  asked that Hubble stop seeking to verify from them.

39.    Further, Hubble was aware it sold Hubble lenses to many consumers whose eye care prescribers did not prescribe them.  This knowledge was evident in that:

      a.    eye care prescribers repeatedly told Hubble that they did not prescribe Hubble lenses;

      b.    many subscribers told Hubble—often after they had already received several months of Hubble lenses—that they did not have, or had never had, a Hubble prescription; subscribers sent Hubble pictures of their prescriptions, showing that they were prescribed different lenses;

    c.    subscribers informed Hubble that their prescription was for toric or multifocal lenses, and Hubble does not sell toric or multifocal lenses; and

    d.    some subscribers informed Hubble that they incurred an eye infection, inflammatory response, or had contact lenses stick to their eyes because they were wearing Hubble lenses without being fitted for the lenses.

40.     According to a Hubble retention analysis from February 2018, between 40-50% of Hubble customers cancel their subscription by the end of month three.  A Hubble survey conducted at the same time asked consumers to select the top three reasons for cancelling their subscription, and found 24% of customer cancellations were because the customers needed multifocal or toric lenses (which Hubble doesn't make or sell), 13% were because customers said they "couldn't see out the lenses" (which should not occur if they had been fitted for the lenses), 22% were because customers found the lenses uncomfortable (likewise, in most instances), and 18% were because the customers' eye care prescribers would not let them wear Hubble lenses. Based on this information, Hubble knew, or should have known, that numerous Hubble customers had never been fitted for, and did not have a prescription for, Hubble lenses.

41.     Although Hubble was aware that many of its customers were never fit for Hubble lenses, it instructed its representatives to assume, when communicating with customers, that customers had been fit for Hubble contacts.  Hubble told its representatives:  "If and when [consumers] admit to not being fit for Hubble, that's when you cancel . . . but there's no need to drag it out of them."

42.      When customers complained to Hubble that the lenses they received were not appropriate for their eyes or were not prescribed,  Hubble responded by claiming that consumers had agreed to Hubble's Terms of Service when they made their purchase, and these terms state it

is the customer's responsibility to ensure they enter their information "in full conformity" with the prescription.  But customers can only view the Terms of Service (which is 10 or 11 pages long, depending on the time period) by clicking on a hyperlink in small font, buried in the Hubble website.

### Defendant's Misleading Assurances to Consumers

43.     Hubble made several assurances to consumers that they would receive lenses prescribed by their prescriber.  In many instances, and in the following ways, Hubble represented that, before sending their lenses, Hubble would actively verify and ensure the prescription information is accurate with their prescribers:

  a.     After entering lens powers, consumers were asked to enter their prescribers' contact information, after the statement "[w]ith this [or later, your] information, we'll verify your prescription with your doctor."

  b.     Prior to checking out, customers were congratulated on their two weeks of free contacts and told, "By checking out you're also asking us to verify your prescription with your doctor now and down the road when it expires.  Don't worry - we'll contact you before we re-verify."

  c.     When consumers looked to the Hubble website for more information about Hubble's lenses, the website informed them that the base curve and diameter used for Hubble lenses "are suitable for almost all people who wear contact lenses and have no or a mild astigmatism. . . .  But don't worry!  This is why we verify your prescription with your doctor- to make sure we have the correct information."

d.      When consumers looked to the Hubble website for more information about how to order without a physical copy of their prescription, the website told them, "It's easy! When checking out, just indicate your power for each eye, select your doctor from our database, confirm the rest, and we'll reach out to your doctor on your behalf to ensure we have the right information."

e.      When consumers looked to the Hubble website for more information about whether their subscription would terminate when their prescription expired, the website told them, "No, don't worry! Before you check out, we alert you that as part of your subscription we'll reach out to your doctor when your prescription is expiring to ensure it's still valid and accurate and that shipments to you may continue uninterrupted."

f.      In customer service communications, Hubble's agents repeatedly told consumers inquiring about how to provide their prescription information to "just indicate your power for each eye, select your doctor from our database, confirm the rest, and we'll reach out to your doctor on your behalf to ensure we have the right information."  When consumers asked if they could send in a copy of their prescription, agents responded, "No need as we will be verifying the order with the Doctor."

g.      Hubble's agents were also instructed that they should "assume that verification=doctor approval," and it was preferable to refer to the process as "doctor approval" rather than "verification" when communicating with consumers.

44.     Many customers expressed confusion to Hubble as to why Hubble sent them lenses other than those prescribed, since they had relied on Hubble's assurances that it would check with their eye care practitioner to "ensure" they received the right prescription.

45.     In fact, Hubble did not ensure that consumers received lenses with the correct prescription, and did not actively confer with prescribers for the vast majority of customer orders.  Instead, Hubble sent flawed and often incomprehensible verification messages to prescribers, and then, when the prescribers failed to respond with a denial within eight business hours, treated the order as passively verified and sent consumers lenses they had never been fitted for.  Regardless of the quality of Hubble's verification requests, Hubble promised more than passive verification—it promised that it would ensure that customers would receive the right prescription—and this it made no effort to do.

**Defendant's Recordkeeping Involving Prescriptions and Prescription Verification**

46.     Hubble received communications from prescribers responding to verification requests.  At times relevant to the Complaint, Hubble failed to maintain faxes prescribers sent it, and failed to maintain a record of the time and date the faxes were received, in violation of the Contact Lens Rule.

47.     Hubble maintains logs containing information concerning telephone communications from prescribers regarding verification requests.  In many instances, however, these logs did not describe the information communicated by the prescriber or the prescriber's staff, and did not contain the names of the individuals who participated in the call, in violation of the Contact Lens Rule.

48.     In numerous verification calls and faxes Hubble failed to provide the prescriber with the time of the verification request, as required by the Contact Lens Rule.  This information

is important so that the prescriber knows how much time she has to respond to the request before Hubble could consider the order passively verified and sell the lenses.

### Providing a Free Month's Supply of Lenses in Exchange for Customer Reviews

49.     Hubble sometimes pointed prospective customers and investors to customer reviews of its product as a way to reassure them or convince them to try Hubble.   Hubble made a concerted effort to influence the impression consumers got about Hubble and its lenses, including by attempting to increase the number of positive reviews, thereby reducing the prominence and percentage of negative reviews from consumers and prescribers.

50.     On at least three occasions, Hubble initiated campaigns to increase positive customer reviews by offering existing customers $30 worth of lenses in exchange for a review on the website of HighYa or the New York Better Business Bureau ("BBB").

51.     Both the HighYa and BBB websites publish customer reviews of products and services.

52.     HighYa's website recommends that merchants not offer free products in exchange for reviews because "this practice creates a feeling of obligation among reviewers to only leave 5-star feedback," and further advises consumers, "If a company is offering to pay for a review, our experience has shown that this does not benefit consumers in any way, and it also violates our Terms and Conditions. If a company reaches out and offers to pay you for a review (using money or in exchange for services), please report them using our contact form."

53.     The BBB website requires that anyone posting a review certify, "I understand that BBB reserves the right to not post in accordance with BBB policy, including if I have a personal or business affiliation with the business or I have been offered or received any incentive or compensation to write this review."

54.     Despite HighYa's advice and recommendations, as noted in paragraph 52, and beginning as early as July 2017, Hubble offered at least seventeen customers who had provided positive feedback on Hubble's website or Facebook page a free month of lenses if they would re-post their comments as reviews on HighYa.  At least thirteen customers accepted the offer, re-posted their praise for Hubble as a review on HighYa, and were duly compensated with a free month of lenses worth approximately $30.  Hubble did not advise these customers that they should disclose that they would be compensated for posting a review, and none of the thirteen included such a disclosure with their review.

55.     Beginning as early as November 2017, Hubble stepped up its campaign to increase positive reviews and began sending emails to a large number of Hubble customers who had made four or more orders, offering a free one-month's supply of Hubble contact lenses—equivalent to approximately $30 at Hubble's then-monthly rate—if the customer would (a) write a review of Hubble on HighYa and (b) send Hubble a screenshot of the published review.  At least thirty-seven customers—and quite possibly many times that number—accepted Hubble's offer and published reviews.  Hubble then compensated them with a free month's supply of lenses.  Hubble did not advise consumers to disclose that they would be compensated for their review, and only in extremely rare instances, did consumers include such a disclosure with their review.

56.     In February 2018, Hubble became concerned about a low BBB rating of the company, and the negative impression such a rating might have on potential customers.   Hubble asked the BBB about its low rating, and was told that it was due, in part, to the number of customer complaints Hubble had received.

57.     In an attempt to improve Hubble's BBB rating, then co-CEO Jesse Horwitz, after

asking "have we talked w BBB team about anything we can pay them to get our rating up?",

orchestrated another review promotion to, in his words, "rustle up" some positive reviews.

Despite the BBB policy noted in paragraph 53, Hubble sent emails to at least 53 customers

offering a free month of lenses in exchange for posting a review to the BBB website and sending

Hubble a screenshot of the published review.  Several customers accepted Hubble's offer and

submitted reviews to the BBB site.  Hubble then compensated them with a free month's supply

of lenses.  Hubble did not advise customers to disclose that they would be compensated for their

review, and none of the reviews on the BBB site include such a disclosure.

58.     One reviewer of Hubble on the BBB website wrote, "I love this company!!! Omg

I'm so sick of everyone complaining because they don't know how to follow instructions.

Literally was so simple. … I don't have to wait long if I have a question too and want to call

them up which is surprising. Overall very satisfied customer here!"  Then co-CEO Benjamin

Cogan responded to this post, "Thanks a bunch! We are so glad you are loving your Hubble

Lenses! Hope you have a great day!"

59.     The author of the review cited above in Paragraph 58 was, at the time she wrote

the review, the Director of Customer Experience for Hubble Contacts.  She did not disclose her

material connection to Hubble in her post, and Benjamin Cogan did not disclose it in his

response.  She is still an employee at Hubble.

60.     Based on the facts and violations of law alleged in this Complaint, Plaintiff has

reason to believe that Hubble is violating or is about to violate laws that it enforces because,

among other things, Hubble engaged in its unlawful acts and practices willfully and knowingly

over a period of several years, and continued such practices despite numerous complaints from

prescribers, consumers, and regulators.  Hubble altered some of its unlawful practices only after the FTC began pursuing an investigation, and after the FTC amended the Contact Lens Rule to more explicitly prohibit certain practices.  Hubble remains in the contact lens business—indeed, it has expanded to third-party selling of other companies' lenses—and maintains the means, ability, and incentive to resume its unlawful conduct.

## VIOLATIONS OF THE CONTACT LENS RULE

61.     Congress enacted the FCLCA, 15 U.S.C. §§ 7601-7610, in 2003.  The FCLCA directed the FTC to promulgate a trade regulation rule implementing the FCLCA.  The Commission promulgated the Contact Lens Rule, 16 C.F.R. Part 315, on July 2, 2004, pursuant to Section 8 of the FCLCA, 15 U.S.C. § 7607, and Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553.  The Contact Lens Rule went into effect on August 2, 2004.  As noted above, the Rule was amended, and the amendments went into effect on October 16, 2020.

62.     Pursuant to Section 9(a) of the FCLCA, 15 U.S.C. § 7608(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice, in violation of Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).  Under Section 5(m)(1)(A), 15 U.S.C. § 45(m)(1)(A), anyone whose action violates the Rule with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by the Rule is liable for a civil penalty for each violation.

## COUNT I

### Failure to Obtain or Properly Verify Contact Lens Prescriptions

63.     In numerous instances, in connection with the advertising and sale of contact lenses, Defendant has sold contact lenses to customers without obtaining the customers' contact lens prescriptions or verifying the prescriptions by direct communication (completed

communication by telephone, facsimile, or electronic mail) with the prescribers in violation of Section 315.5(a) of the Contact Lens Rule, 16 C.F.R. § 315.5(a).  Many verification calls placed by the Defendant were incomplete or incomprehensible, as described in Paragraphs 21 to 31 above.  Such calls did not include all of the required information and therefore, Defendant did not verify the prescriptions by direct communication.  Further, the Defendant placed some verification calls to phone numbers that were not eye care prescribers, did not properly verify prescription information after being provided with fictitious prescriber information, or failed altogether to verify, or verify properly, prescription information, as described in Paragraphs 32 to 34 above, and therefore, Defendant did not verify the prescriptions by direct communication. Since Defendant did not obtain prescriptions from customers for Hubble lenses for virtually all of its sales, and instead relied on verification, all sales made pursuant to the aforementioned deficient verification attempts violate Section 315.5(a) of the Contact Lens Rule, 16 C.F.R. § 315.5(a). Defendant violated the Rule with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT II

### Selling After Denial

64.     In at least one instance, in connection with the advertising and sale of contact lenses, Defendant sold contact lenses after receiving notice from a prescriber, within eight business hours of a contact lens verification request, that a contact lens prescription is inaccurate, expired, or otherwise invalid, as described above in Paragraph 35, in violation of Section 315.5(d) of the Contact Lens Rule, 16 C.F.R. § 315.5(d).  Defendant violated the Rule with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT III

### Contact Lens Alteration

65.     In numerous instances, in connection with the advertising and sale of contact lenses, Defendant altered contact lens prescriptions by substituting Hubble lenses for the prescribed lenses, as described in Paragraphs 37 to 42 above, in violation of Section 315.5(e) of the Contact Lens Rule, 16 C.F.R. § 315.5(e).  Defendant violated the Rule with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT IV

### Recordkeeping Violations

66.     In numerous instances, in connection with the advertising and sale of contact lenses, Defendant failed to maintain records of contact lens prescriptions; records of and relating to verification requests; and direct communications from, and records relating to direct communications from, contact lens prescribers, as described in Paragraphs 46 to 48 above, in violation of Section 315.5(f) of the Contact Lens Rule, 16 C.F.R. § 315.5(f). Defendant violated the Rule with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. §45(m)(1)(A).

### VIOLATIONS OF THE FTC ACT

67.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

68.     Pursuant to Section 9(a) of the FCLCA, 15 U.S.C. § 7608(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Contact Lens Rule constitutes an unfair or deceptive act or practice, in violation of Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

69.     By and through the acts and practices described in Paragraphs 63 to 66 above, Defendant has violated Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

70.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

71.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.  For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, contact lenses are a "device" as defined in Section 15(d) of the FTC Act, 15 U.S.C. § 55(d).

## COUNT V

### Deceptive Representations

72.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of contact lenses, including through the means described in Paragraphs 43 to 45, Defendant represented, directly or indirectly, expressly or by implication that Hubble would ensure that customers receive lenses with valid and accurate prescriptions as prescribed by the customers' eye care practitioners.

73.     In truth and in fact, in numerous instances in which the Defendant made the representation set forth in Paragraph 72, Hubble did not ensure that customers received lenses with valid and accurate prescriptions as prescribed by the customers' eye care practitioners.

74.     Therefore, the making of the representation, as set forth in Paragraph 72 was false or misleading and constituted a deceptive act or practice, and the making of a false advertisement, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

## COUNT VI

### False Claim of Independent Reviews

75.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of contact lenses, including through the means described in Paragraphs 54 to 59, Defendant has represented, directly or indirectly, expressly or by implication, that reviews or endorsements of Hubble and its contact lenses, including an employee's review of Hubble posted on the BBB's website, reflect the opinions or experiences of ordinary unbiased customers.

76.     In truth and in fact, these customer reviews do not reflect the opinions or experiences of ordinary unbiased customers, but instead were written either by a paid employee of Hubble or by individuals compensated with a free month's supply of Hubble lenses.

77.     Therefore, the making of the representation, as set forth in Paragraph 75 was false or misleading and constitutes deceptive acts or practices, and the making of false advertisements, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

## COUNT VII

### Failure to Disclose Material Connections

78.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of contact lenses, including through the means described in Paragraphs 55 to 59 Defendant has represented, directly or indirectly, expressly or by implication, that customer reviews or endorsements of Hubble and its contact lenses posted on the HighYa and BBB websites reflected their customers' opinions or experiences.

79.     In numerous instances in which the Defendant has made the representation set forth in Paragraph 78, Defendant has failed to disclose, or disclose adequately, that some of those

customers received compensation in the form of a free month's supply of contact lenses, to post those reviews on the HighYa and BBB websites.  This fact would be material to consumers in evaluating the reviews in connection with a purchase or use decision.

80.     When Defendant made the representation set forth in Paragraph 78, Defendant failed to disclose, or disclose adequately, that a review was left by a paid employee of Defendant.  This fact would be material to consumers in evaluating the review in connection with a purchase or use decision.

81.     Defendant's' failure to disclose or disclose adequately the material information described in Paragraphs 79 and 80, in light of the representation set forth in Paragraph 78, constitutes a deceptive act or practice, and the making of false advertisements, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

## CONSUMER INJURY

82.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the Contact Lens Rule.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, pursuant to Sections 5(a)(1), 5(m)(1)(A), 13(b), 16(a)(1) and 19 of the FTC Act, 15 U.S.C. §§ 45(a)(1), 45(m)(1)(A), 53(b), 56(a)(1) and 57b, Section 9 of the FCLCA, 15 U.S.C. § 7608, and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the Contact Lens Rule by the Defendant;

B.      Award such relief as the Court finds necessary to address the Defendant's

violations of the FTC Act and the Contact Lens Rule, including rescission or reformation of

contracts, the refund of monies paid, and other relief necessary to redress injury to consumers

resulting from the Defendant's violations.

C.      Award Plaintiff monetary civil penalties from the Defendant for each violation of

the Contact Lens Rule alleged in this Complaint; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

DATED:   January 25, 2022


**FOR THE UNITED STATES:**

BRIAN M. BOYNTON
Acting Assistant Attorney General

ARUN G. RAO
Deputy Assistant Attorney General

GUSTAV W. EYLER
(D.C. Bar No. 997162)
Director
Consumer Protection Branch

LISA K. HSIAO
(D.C. Bar No. 444890)
Assistant Director
Consumer Protection Branch

/s/ Claude F. Scott, Jr.
CLAUDE F. SCOTT, JR.
(D.C. Bar No. 414906)
Senior Litigation Counsel
Consumer Protection Branch
U.S. Department of Justice
450 5th Street, NW
Washington, DC 20001

Telephone: (202) 414-9571-9027
Facsimile: (202) 514-8742
Email: Claude.F.Scott@usdoj.gov


**FOR THE FEDERAL TRADE COMMISSION**

Alysa S. Bernstein, Attorney
Paul Spelman, Attorney
600 Pennsylvania Avenue, N.W.
Room CC-10561
Washington, DC 20580
Telephone: (202) 326-3289 (Bernstein)
          (202) 326-2487 (Spelman)
Facsimile:  (202) 326-3259
abernstein@ftc.gov
pspelman@ftc.gov